| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | NOT FOR PUBLICATION |
|---|---|
| SKIBOKY STORA, | |
| Plaintiff, | |
| – against – | MEMORANDUM & ORDER |
| THE CITY OF NEW YORK, DETECTIVE CARL MCLAUGHLIN, AND OFFICER "JOHN DOE," | 16-CV-4541 (ERK) (SJB) |
| Defendants. | |

KORMAN, *J.*:

Plaintiff Skiboky Stora sued New York Police Department ("NYPD") Detective Carl McLaughlin, Officer "John Doe," and the City of New York under 28 U.S.C. § 1983 for federal civil rights violations arising out of his arrest on May 12, 2015. Stora alleges that Detective McLaughlin wrongfully arrested him and unreasonably punched him in the head when Stora was present at the 67th Precinct in order to identify his ex-girlfriend, who had violated Stora's order of protection against her.

## BACKGROUND

Both parties present a different version of the events, each plagued with their own inconsistencies. Plaintiff Skiboky Stora's version of events is as follows: Stora resided in a Brooklyn apartment with his girlfriend, Tina London, and her four minor children.[1] Am. Compl. ¶¶ 16-18, ECF No. 2. After a violent incident in the home the previous night, *see id.* ¶¶ 19-24, the Kings County Criminal Court issued orders of protection in Stora's favor against Tina and her adult son, Kenneth, on April 27, mandating that they refrain from being present at his home,

---

[1] Stora testified that both his and Tina's names were on the lease for the apartment, but the bills were in his name, and he paid the entirety of the rent. Stora Dep. at 58:2-6, 14-20, 23-24, ECF No. 44-10.

communicating with him via telephone, email, or any other means, and assaulting, harassment, intimidating, or threatening him. *Id.* ¶ 26; Dudelson Decl., Pl.'s Ex. D., ECF 44-4. Later the same day, after obtaining the order or protection and receiving "nine or ten stiches over the head," Stora Dep. at 40:25-41:1, Stora returned home. He used his keys to enter his and Tina's apartment, and once inside, found his bathroom door locked. *Id.* at 43:2-9, 47:25-48:1. Suspecting that it was Kenneth locked in the bathroom, Stora called 911. *Id.* at 53:12-14. The police arrived and arrested Kenneth for violating Stora's order of protection against him. *Id.* at 43:11-16. No property was damaged. *Id.* at 55:5-7.

Stora's version of events diverges most from Kenneth and Tina's version of events as to whether Kenneth or Stora was the trespasser on April 27. On April 30, 2015, Tina, reported to the 67th Precinct that, on April 26, Stora broke in through a window to (what she refers to as her apartment) to steal and damage property inside. Speight Decl., Defs.' Ex. G, ECF No. 49-7 ("Tina Police Report"); Defs.' Rule 56.1 Statements ¶ 1, ECF No. 47 ("Defs.' 56.1 Stmts."). Because Tina did not personally observe Stora breaking into her apartment, Detective Carl McLaughlin met with Tina's son, Kenneth, who claims to have resided at the apartment and been present on April 26 while "Skiboky Stora and another man climbed from the roof and entered their apartment without permission and removed items from the apartment." Dudelson Decl., Defs.' Ex. H, ECF No. 49-8 ("Kenneth Police Report"); Defs.' 56.1 Stmts. ¶ 5. Both Tina and Kenneth explained that NYPD officers arrived at the scene but "over [and] over . . . refused to arrest [Stora] or even search the bag he had" because the officers "said he lives here and he can go," Pl.'s Rule 56.1 Counter-Statements ¶ 1, ECF No. 43 ("Pl.'s 56.1 Stmts.") (quoting Tina Police Report), and advised that Stora could enter the apartment "unattended and get his stuff." *Id.* ¶ 5 (quoting Kenneth Police Report).

In investigating these reports, Detective McLaughlin asserts that he telephoned Stora's mother, Joan Taylor, at a number associated with Stora, prior to Stora's arrest. Defs.' 56.1 Stmts. ¶ 9. He claims that Taylor told him that Stora was "not home right now" but did "live[] here with me" at the time. *Id.* Taylor submits that she never spoke by phone or in person with Detective McLaughlin, never advised any law enforcement officer that her son lived at her residence with her, nor was he living with her at the time. Taylor Aff., ECF No. 44-2.

Stora and Detective McLaughlin communicated by telephone on May 10. During that call, Stora informed Detective McLaughlin that Kenneth and Tina had violated Stora's order of protection against them, Am. Compl. ¶ 32; Defs.' & Pl.'s 56.1 Stmts. ¶¶ 10-11, and Detective McLaughlin advised Stora that Tina had been arrested following Stora's complaint. Pl.'s 56.1 Counter-Stmts. ¶ 18, ECF No. 43. Acting on this information, Stora appeared at Kings County Criminal Court the next day to inquire into the status of Tina's arraignment, but was informed by the clerk of the court that there was no record of arrest. Pl.'s 56.1 Counter-Stmts. ¶¶ 19-20. Stora called the 67th Precinct and communicated to Lieutenant Williams that Detective McLaughlin incorrectly informed him that Tina was arrested. *Id.* ¶ 21.

On May 12, at around 6:00 a.m., Detective McLaughlin called Stora, requesting that he come into the 67th Precinct to identify Tina and Kenneth before they could be arrested for violating Stora's order of protection against her. Defs.' & Pl.'s 56.1 Stmts. ¶ 12; Pl.'s 56.1 Counter-Stmts. ¶¶ 22. Upon his arrival, Stora complains that Detective McLaughlin placed him in a locked interrogation room for nearly three hours. Pl.'s 56.1 Counter-Stmts. ¶ 23.

Stora claims that Detective McLaughlin came into the interrogation room at one point and warned, "[Y]ou called my Lieutenant and made a problem for yourself." Pl.'s 56.1 Counter-Stmts. ¶ 24. Detective McLaughlin then arrested Stora for burglary based upon Tina's and Kenneth's reports, despite Stora's assertion that he resided at the apartment allegedly burglarized. Defs.' &

3

Pl.'s 56.1 Stmts. ¶¶ 15-16. Stora testified that Detective McLaughlin cited Stora's call to his Lieutenant as the motivator for his actions against Stora that day. Stora Dep. 36:24-37:7. After being placed in handcuffs, Stora alleges that he was taken to a nearby holding cell and that Detective McLaughlin stated, "You called my Lieutenant yesterday. You messed around with the wrong gang. Are you trying to get me in trouble." Pl.'s 56.1 Counter-Stmts. ¶ 32. Stora explains that he did not see the approximately "250 pound[]" Detective McLaughlin approach him or make contact with him, but felt "one or two punches" "with a closed fist." Defs.' 56.1 Stmts. ¶¶ 27-29; Stora Dep. 90:5-16. No other people were present when the alleged punch occurred, Defs.' 56.1 Stmts. ¶ 25, although Stora testified that there was another officer present in the interrogation room when the arrest occurred, Stora Dep. 91:12-24.

Stora did not report the injury to Central Booking or anyone else at the police station because Detective McLaughlin allegedly threatened to "kill [him] and [his] family" if he told anyone. *Id.* at 112:14-18. Kings County Hospital records indicate that Stora was seen three days later, on May 15, 2015, for follow-up on a previous nose facture; there is no mention of an injury to the head. Defs.' 56.1 Stmts. ¶ 34; Speight Decl., Defs.' Ex. N, ECF 49-14 ("May Med. R."). Stora's physician's records indicate that he also sought medical care on December 30, 2015, for pain management, primarily for his back and knee, but did not report any injury to his head. Defs.' Stmts. ¶ 35; Speight Decl., Defs.' Ex. O, ECF 49-15 ("Dec. Med. R."). Although unsupported by medical documentation, Stora testifies that he continues to suffer "blackouts [and] . . . anxiety," Stora Dep. 91:6-11, as well as pain from an enduring "lump on the back of [his] head" and "fear of police and . . . sleeping problems all compounded by [his] Post Traumatic Stress Disorder." *Id.* at 110:1-24.[2]

---

[2] Prior to this event, Stora suffered several gunshot wounds in the back at a homeless shelter, from which he continues to receive treatment for chronic back pain and Post Traumatic Stress Disorder ("PTSD"). The

On August 15, 2016, Stora filed a complaint against The City of New York, Detective McLaughlin, and Officer "John Doe" ("a fictitious name intended to be a[n] [NYPD] officer"), alleging excessive use of force, false arrest, and malicious prosecution by Detective McLaughlin; failure to intervene by Officer John Doe; and various constitutional violations by the City of New York. *See* Compl., ECF No. 1. Stora now concedes that he does not have a valid cause of action against the City of New York or Officer John Doe. Opp. 19, ECF No. 45. Thus, I dismiss both Officer Doe and the City of New York from this action. This leaves Detective McLaughlin as the sole defendant now seeking summary judgment.

**DISCUSSION**

I.  *The Summary Judgment Standard*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). A "genuine" dispute is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must 'examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Frito Lay, Inc. v. LTV Steel Co.*, 10 F.3d 944, 957 (2d Cir. 1993)). On summary judgment, a district court judge "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of*

---

PTSD causes him to get "panic attacks," "nightmares," and to be easily "overwhelmed with stress." Stora Dep. at 15:3-16:1, 16:9-19.

*Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

## II. False arrest claim

A plaintiff asserting a false arrest claim under Section 1983 must prove that "(1) the defendant intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975). The only element at issue here is whether the arrest was privileged. Confinement is privileged when probable cause to arrest exists. *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003). Probable cause to arrest is a complete defense to a false arrest claim. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). The defense "requires the arresting officer to have 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quoting *Singer*, 63 F.3d at 119). Probable cause is based on the totality of the circumstances. *Kent v. Katz*, 312 F.3d 568, 576 (2d Cir. 2002). "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006); *see also Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2010).

Detective McLaughlin argues that he is entitled to qualified immunity as long as Stora's arrest was at least supported by "arguable probable cause," which exists when "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *See Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991); *Cerrone v. Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001) ("Arguable probable cause exists when a reasonable police officer in the same

6

circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." (quotation marks and citation omitted)).

The purpose of qualified immunity is to "give[] government officials breathing room to make reasonable but mistaken judgments" by "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Only when an officer's conduct is "objectively unreasonable," meaning "no officer of reasonable competence could have made the same choice in similar circumstances," is he denied qualified immunity. *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995).

Detective McLaughlin argues that he was not provided with any information that overcame the presumption of veracity of Tina's and Kenneth's reports that it was Stora who broke into Tina's home, rather than Kenneth who broke into Stora's home. Mem. of Law in Support of Defs.' Mot. for Summ. J. 7, ECF No. 48 ("Defs.' Br."). This is incorrect. Detective McLaughlin knew that officers at the scene on April 27 "refused to arrest" Stora or even to search his bag, but rather allowed him to enter the home, stating something to the effect of "He lives here. He can go." *See* Tina Police Report; Kenneth Police Report. Despite the fact that officers at the scene found no probable cause to arrest (or even to search) Stora, Detective McLaughlin decided to arrest Stora approximately two weeks later. This was not the type of "on-the-spot judgment[] in tense circumstances" for which special deference would be due. *See Lennon*, 66 F.3d at 424.

Second, Detective McLaughlin arrested Stora for burglarizing the same home which Stora informed Detective McLaughlin was *his* home. McLaughlin Dep. 32:18-20, ECF No. 49-6. Upon hearing this, McLaughlin did not "follow-up at all" or "ascertain if he actually lived there" *Id.* 32:18-25. Detective McLaughlin responds that he had previously investigated Tina's and

7

Kenneth's complaints. After confirming with Stora's mother by phone that Stora resided with her rather than at the address he supposedly burglarized, Detective McLaughlin reasonably believed that Stora did not live at the address in question. *See* Defs.' 56.1 Stmts., ¶¶ 9, 17. However, Stora's mother, Joan Taylor, submitted an affidavit claiming that she never spoke by phone or in person with Detective McLaughlin, never advised any law enforcement officer that her son resided at her residence with her, and that her son was *not* living with her at the time. Taylor Aff. On summary judgment, the facts must be viewed in the light most favorable to the non-moving party, so I cannot agree with Detective McLaughlin that he heard from Stora's mother that he lived at her residence, or consequently, that probable cause to arrest Stora existed.

Third, and most importantly, Detective McLaughlin knew about Stora's orders of protection against the complaining victims. The entire reason that Stora arrived at the 67th Precinct was because Detective McLaughlin informed Stora that the police were arresting Tina and Kenneth London for violating the order of protection and needed Stora to identify them. Stora Dep. 32:4-7; Defs.' 56.1 Stmts. ¶¶ 11-14.

Considering the totality of the circumstances, neither probable cause nor arguable probable cause to arrest Stora existed at the time of the arrest. Orders of protection against the complaining victims certainly qualify as the type of "circumstances [that] raise doubts as to the person's veracity." *See Fabrikant*, 691 F.3d at 216. Moreover, the amount of exculpatory evidence – the fact that officers at the scene of the alleged burglary believed Stora to be a resident of the home and refused to arrest him, and that Stora protested to Detective McLaughlin that he resided there – is more than enough to determine that Detective McLaughlin did not "have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed," *Martinez*, 202 F.3d at 634 (quotation marks omitted),

or that "the officer in question could [not] have reasonably believed that probable cause existed," *Cerrone*, 246 F.3d at 202-03.

Moreover, Stora claims (and Detective McLaughlin disputes) that, "While in the holding cell, Detective Carl McLaughlin punched the [p]laintiff in the back of the head and stated: 'You called my Lieutenant yesterday. You messed around with the wrong gang. Are you trying to get me in trouble.'" Pl.'s 56.1 Counter-Stmts. ¶ 32. Crediting Stora's version of events, Detective McLaughlin arrested Stora, not because he reasonably believed Stora committed a crime, but because of ill-will towards him.

### III. *Malicious prosecution claim*

To prevail on a malicious prosecution claim, a plaintiff must establish a "deprivation of liberty . . . effected 'pursuant to legal process.'" *Singer*, 63 F.3d at 117 (quoting *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)). A plaintiff also must allege the four elements of malicious prosecution: 1) the defendant's initiation of a criminal proceeding against plaintiff, 2) termination in plaintiff's favor, 3) lack of probable cause, and 4) actual malice. *See Swartz v. Insonga*, 704 F.3d 105, 111-12 (2d Cir. 2013).

While I find that Stora prevails on three out of four of the above elements, the Second Circuit recently clarified the contours of the "favorable termination" element, such that it is now definitively resolved against Stora. *See Lanning v. City of Glens Falls*, 908 F.3d 19, 28-29 (2d Cir. 2018). Under New York state law, the second prong may be satisfied if the plaintiff establishes that "the prosecution terminated in a manner not inconsistent with plaintiff's innocence." *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 198 (2000); *see also Cantalino v. Danner*, 96 N.Y.2d 391, 395-96 (2001). But *Lanning* held that federal law governs resolution of a Section 1983 malicious prosecution claim and that, under federal law, the plaintiff must demonstrate that termination

affirmatively indicates his innocence.³ *Lanning*, 908 F.3d at 28-29. Specifically, "[p]roceedings are 'terminated in favor of the accused' only when their final disposition is such *as to indicate the accused is not guilty.*" *Id.* at 26 (quoting *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980)) (emphasis added). The *Singleton* Court held that proof that the "prosecution terminated in some manner indicating that the person was not guilty of the offense charged" is "essential." *Singleton*, 632 F.2d at 194-95. Applying this rule, the Second Circuit denied Lanning's malicious prosecution claim because "the charges against him 'were dismissed' at some point after a jury trial, without specifying how or on what grounds," and "[t]his vague allegation is consistent with dismissal on any number of procedural or jurisdiction grounds, all of which fail to affirmatively indicate innocence." *Lanning*, 908 F.3d at 28. Further, "where a dismissal in the interest of justice 'leaves the question of guilt or innocence unanswered [,] . . . it cannot provide the favorable termination required as the basis for [that] claim.'" *Id.* at 28-29 (quoting *Hygh v. Jacobs*, 961 F.2d 359, 367-68 (2d Cir. 1992)).

Stora similarly cannot produce any evidence to affirmatively establish his innocence. Stora implicitly concedes this by arguing extensively on appeal that New York state law does not require a plaintiff to prove that termination was indicative of innocence. Opp. 13-14. Moreover, while it is undisputed that the criminal prosecution against Stora was "not dismissed on a speedy trial violation, adjourned in contemplation of dismissal, or a result of the plaintiff's *Clayton* motion [to dismiss in the interests of justice]," Stora can only state that "[i]t was the Office of the District

---

³ Previously, the Second Circuit had held that malicious prosecution claims under Section 1983 and New York state law are "substantially the same." *Jocks*, 316 F.3d at 134; *see also Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) ("And § 1983, in recognizing a malicious prosecution claim when the prosecution depends on a violation of federal rights, adopts the law of the forum state so far as the elements of the claim for malicious prosecution are concerned."). The Second Circuit revised this position in *Lanning* so that "federal law defines the elements of a § 1983 malicious prosecution claim, and . . . a State's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements. *Lanning*, 908 F.3d at 25.

Attorney that moved to have the case dismissed and sealed" and that this "dismissal of the complaint was *not inconsistent* with the plaintiff's innocence." Opp. 14 (emphasis added). This does not satisfy the standard *Lanning* recently clarified, so I dismiss the claim.

IV. *Excessive force claim*

The Supreme Court has held that, when evaluating whether force against a pretrial detainee is actionable under the Due Process Clause, an inquiry into the subjective intent is no longer necessary. The only relevant inquiry is an objective one: Whether the "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). Objective reasonableness is determined by the "'facts and circumstances of each particular case'" and is determined "from the perspective of a reasonable officer . . . including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A non-exclusive list of factors to consider includes: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* While the standard is no longer whether the force shocks the conscience, "*Kingsley* teaches that purposeful, knowing or (perhaps) reckless action that uses an objectively unreasonable degree of force *is* conscience shocking." *Edrei v. Maguire*, 892 F.3d 525, 536 (2d Cir. 2018) (emphasis in original).

While Stora is not a typical pretrial detainee, because he was not awaiting trial, the due process legal analysis applicable to pretrial detainees is more applicable to his situation than the Fourth Amendment for excessive force in the course of arrest. *See Edrei v. Maguire*, 892 F.3d 525, 536 (2d Cir. 2018) (explaining that *Kingsley* did not draw a distinction between pretrial detainees and non-detainees but rather between claims brought under the Eighth Amendment and the Fourth

11

Amendment). Nevertheless, for present purposes, the result is the same under either the Fourth or Fourteenth Amendments. In either cause of action, the test is one of the necessity for, and the objective reasonableness of, the use of force. In this case, a jury could find the alleged act of Detective McLoughlin in punching Stora in the head once or twice was unreasonable. Indeed, Detective McLoughlin has not chosen to defend his actions on the ground that they were reasonably necessary under the circumstances. Moreover, Detective McLoughlin did not even submit an affidavit opposing Stora's motion for summary judging denying that he punched Stora, nor was he asked about it at his deposition.

"The extent of the plaintiff's injury" factor weighs heavily against a finding of excessive force. Stora's claim is unlike *Edrei*, 892 F.3d at 538, where the plaintiffs "endured auditory pain, migraines, tinnitus, and hearing loss, of varying degrees and duration," which the Second Circuit found to "fit comfortably on the spectrum of injuries that this Court has found sufficient to state a Fourteenth Amendment violation. Stora admits that he did not report the alleged punch or resulting injury to Central Booking or anyone else in police custody following his arrest. *See* Defs.' 56.1 Stmts ¶¶ 30, 32-33. While Stora testified that he "immediately" went to see a doctor ("during the same week") for his head injury, Stora Dep. 112:21-24, his visit to the doctor on May 15, 2015 was to follow-up on a prior nose fracture. May Med. R. Complaints of head pain or observations of a "lump" or other abnormalities on the head are absent from the physician's documentation of that visit. *See id.* On December 30, 2015, seven and a half months after the incident, Stora visited a medical practice seeking pain management treatment primarily for his lower back and knee. Dec. Med. R. Again, no reports of head pain or other head-related symptoms are documented. *Id.*

In response to a question at his deposition of what injury he has suffered from the alleged assault, Stora testified: "I get blackouts . . . I got anxiety, you know, stuff like that, you know, I have this very bad, you know, this guy left this bad odor and taste, you know, that when I hear the

word 'police' I think about things, like this guy is really a bad guy." Stora Dep. 91:4-16. Then, in a sworn letter filed over a year following his deposition, Stora claims, among other symptoms, that "*[s]ince the date of the incident* of May 12, 2015 . . . [he] has been having headaches and chronic back pain . . . [and] is taking . . . . medicine . . . for the [p]ain." Ltr., ECF No. 54 (emphasis added).[4] This is not only inconsistent with his failure to tell any medical personnel who he saw following the alleged incident and a physician who he had seen as late as December 2015, but none of the symptoms he described are accompanied by any evidence in the medical records or expert testimony.

Particularly apposite here is Judge Bianco's opinion in *Davenport v. County of Suffolk*, 2007 WL 608125, at *9 (E.D.N.Y. Feb. 23, 2007). The plaintiff there described the injury caused by officers allegedly banging his head on top of a police vehicle during arrest as only a "bump on the head" and put forth no medical evidence in support. Judge Bianco nevertheless allowed the plaintiff to amend his complaint to assert a claim of excessive force because he could not "find that such an amendment would be futile as a matter of law." Judge Bianco observed, "A jury may consider the lack of serious injury as evidence that the implemented force was not excessive, and may weigh it against Davenport's testimony, but that does not mean that there are no circumstances under which Davenport can prevail." *Id.* at *11. *Cf. Santiago v. City of Yonkers*, 2015 WL 6914799, at *9 (S.D.N.Y. Oct. 30, 2015), ("While failure to seek medical treatment and lack of demonstrable injury are not fatal to an excessive force claim, the lack of evidence is not helpful to plaintiff in sustaining the court's belief that a reasonable jury could return a verdict in his favor.").

---

[4] The letter would not be admissible to supplement Stora's deposition testimony. Nevertheless, I cite it here because the gross exaggeration goes to the credibility of his claim that he was even assaulted.

## CONCLUSION

Defendants' motion for summary judgment is granted as to the malicious prosecution claim against Detective McLoughlin and denied as to the false arrest and excessive force claims against Detective McLoughlin. Summary judgment is granted in the defendants' favor as to all claims against the City of New York and Officer "John Doe."

**SO ORDERED.**

*Edward R. Korman*
Edward R. Korman
United States District Judge

Brooklyn, New York
April 18, 2019